ROBINSON v. HALL et al.

(Circuit Court of Appeals, Fourth Circuit. October 2, 1894.)

NATIONAL BANKS—INSOLVENCY—NEGLIGENCE OF DIRECTORS — PERSONAL LIABILITY.

Directors of a national bank left its management for more than three years almost wholly to its cashier, who had but little property, and of whom they required no bond; and they knowingly permitted loans to be made to individuals and firms largely in excess of the amounts allowed by law. They also failed to record mortgages given to secure large debts due the bank, even after they were aware of its insolvency, and erroneously advised an examiner who had taken charge of the bank that it was not necessary to record them. *Held*, that the directors were personally

liable for the losses caused by such neglect and mismanagement, and the fraud and defalcations of the cashier. Briggs v. Spaulding, 11 Sup. Ct. 924, 141 U. S. 132, distinguished. 59 Fed. 648, reversed.

Appeal from the Circuit Court of the United States for the Eastern District of North Carolina.

This was a bill by W. S. O'B. Robinson, receiver of the First National Bank of Wilmington, N. C., against B. F. Hall, James Sprunt, D. G. Worth, G. Herbert Smith, and James H. Chadbourn, directors of said bank, to charge them with personal liability for certain losses caused by their negligence. A demurrer to the bill was sustained. Complainant appeals. Reversed.

This is a suit by a receiver of a national bank against its five directors to subject them personally to losses sustained by the bank as the result of gross negligence in office on their part. The case was tried below on demurrer to the bill of complaint and amendments. The demurrer was sustained, and the question here is whether the defendant directors were liable on the facts set out in the bill and amendments, which are to be taken to be true. Among the averments of the bill were the following: The bank was organized and went into business in 1866, and continued in operation until November 24, 1891, when it suspended. Up to the time of suspension it was in good credit, and believed to be safe and solvent by its creditors and stockholders. It was so held out to the public to be by the defendants, although the contrary was known to all of them for more than two months before its suspension. This insolvency was carefully concealed from all creditors of the bank except such as the defendants, from interest or favoritism, desired to protect. For some time before the failure most of the old and valuable customers of the bank, who habitually had considerable amounts on deposit, were left in ignorance of the bank's condition, while the defendants themselves, who were engaged in large commercial operations, were carefully reducing the balances to their credit to protect themselves from loss. How successful they were in this action will appear in the sequel.

Defendant Worth, through a firm of which he was head, and whose balance had been more than $12,000 a year before, had reduced the balance to $1,324. Defendant Sprunt, although engaged in extensive operations which required the use of heavy sums of money and a large bank deposit, had no balance in the bank on the day of failure, but had overchecked to the amount of $327. Defendant Smith, who, through a firm of which he was head, had had large dealings with the bank, indicated by a deposit of $33,569 twelve months before the failure, had reduced the balance to $665 on the day of that event. Defendant Chadbourn did not keep an account with this bank, and had no funds to his credit at its failure. Defendant Hall, who was president of the bank, and was the head of a mercantile firm which had had on deposit a year before as large a sum as $14,700, had no balance in bank to the credit of the firm on the day of the bank's failure, and its account was overdrawn for more than $150. The bill alleges that the assessment of 100 per cent. required by law to be made upon the shares of the stockholders on the failure of a national bank, together with its assets, will not meet the liabilities of the bank, and that a heavy loss will fall upon depositors and creditors. Defendant Hall, the president of the bank, was paid a salary deemed adequate to compensate him for a close, watchful, and faithful superintendence of the affairs of the bank, a fact which constituted him trustee, with compensation, as well as director.

The defendants, each and all, in disregard of their official duties and trust, permitted the affairs of the bank to be conducted mainly by its cashier, Bowden, leaving all the moneys of the bank under his control, and its employés under his direction. The bonds, stocks, cash, special deposits, and all other personal property of the bank were left as much under the control of this cashier, Bowden, as if they had been his private property; yet no bond was required of him for the faithful performance of his duties, either by the president, Hall, or by the defendant directors. His bond should have been in the penal sum of not less than $15,000. This cashier, Bowden, was largely

indebted to the bank, though he was not possessed of any considerable property. His paper had been carried by the bank for years, and his indebtedness to it had been increased from year to year; all of which had been known to the defendants, who had not required from him a bond at any time. In truth this cashier, Bowden, was a hopeless insolvent, and immediately upon the suspension of the bank fled the country, and became and remains a fugitive from justice, and no judgment which could be recovered against him would be of any value. The amount of the moneys which this cashier, Bowden, took from the bank, and fraudulently converted to his own use, was $9,783. He was cashier from 28th January, 1887, to November 24, 1891,—nearly five years.

The bill gives in detail the methods by which this cashier defrauded the bank of several sums of money which were parts of the aggregate default above stated; the fraudulent transactions beginning in February, 1888, and extending through 1889, 1890, and 1891. One of these transactions is described: He took from the bank, and applied to his own use, $1,312.79, effecting the scheme in the following manner: Smith & Gilchrist being the firm of which defendant Smith was the head, Bowden received this firm's check on the bank for $15,719.79, and charged its account with it. He received the check with the understanding that it should be applied to the payment of a judgment held by the bank against a manufacturing corporation for $14,000, and the remaining sum of $1,312.79 was to pay an overdraft of the company for the latter amount. Instead of applying the whole amount of Smith & Gilchrist's check to the credit of the manufacturing company, Bowden applied only $14,000 to the payment of the judgment against that company, drew out of bank the amount remaining due on the check, applied this to his own use, and left the company still overchecked to the amount he had appropriated to himself, to wit, $1,312.79. This was in May, 1891, six months before the failure of the bank. The defendant directors had in their official possession a mortgage, executed by one Mitchell, a debtor of the bank, which had not been recorded at the time of its failure on the 24th November, 1891. The mortgage was given by Mitchell to secure a debt he owed the bank, with an understanding with defendants that it should not be registered so long as the interest on the debt should be paid as it accrued, and as nothing extraordinary should occur to make its registration necessary for the protection of the bank. This mortgage was never registered by the defendants, even after the failure, and Mitchell made away with the property it covered by putting a second mortgage on it, and his debt to the bank was lost. So, also, the defendants had in possession on the day of the bank's suspension a chattel mortgage which had been given by a certain firm of Northrops as security for a large indebtedness to the bank, pledging property to the value of $15,000. The defendants, instead of registering this chattel mortgage on or after the day of the bank's failure, omitted and neglected to do so, and left the Northrops in full possession of the property covered by it, who did sell and dispose of the property to such an extent that the receiver was not able to realize from the security more than the sum of $6,000; the loss of the bank from the failure of defendants to register being $9,000. The defendants were guilty of similar negligence in regard to a mortgage held by them of one Boatwright, executed to secure a debt originally of $1,000 due to the bank, but which had been reduced to $600. The defendants failed to record this mortgage when the bank suspended, and thereby enabled Boatwright to dispose of property covered by it to purchasers for value to such an extent that the bank realized only $300 from the debt, and lost the rest. Not only did the defendants fail themselves to record the Mitchell, Northrop, and Boatwright mortgages at or after the failure of the bank, but defendant Hall, who was its president, advised the examiner who first took charge of its affairs under the orders of the comptroller of the currency that it was unnecessary to do so, and thereby caused such delay in the registration that heavy losses resulted to the assets of the bank.

Although this bank, in respect to the amount of its capital stock, was prohibited by law from lending more than $25,000 to any one individual or firm, yet these defendants, contrary to law, did lend of the funds of the bank to the Northrops, who have been mentioned, to the amount of $45,000, and to one Kerchner an amount of not less than $40,000, from which excess of loans the

bank sustained heavy losses in consequence of the insolvency of these debtors, and the insufficiency of the securities held for their indebtedness; these losses being not less than $40,000. The defendants, in pursuance of their duty, of which they were fully aware, did exact bonds of two of the officers of the bank who had custody of and access to its funds, and whose names were Burruss and Ford; but failed and neglected to perform this recognized duty in respect to the cashier, Bowden, from whom they required and obtained no bond whatever during his service of nearly five years. The bank was declared to be insolvent, and was put into the hands of an examiner by the comptroller of the currency, on the 26th of November, 1891, the 25th having been Thanksgiving day, and dies non, and the suspension having occurred on the 24th.

D. L. Russell, for appellant.

Sol. C. Weill and E. S. Martin, for appellees.

Before GOFF and SIMONTON, Circuit Judges, and HUGHES, District Judge.

HUGHES, District Judge (after stating the facts). The foregoing were the principal averments of the bill of the receiver of the bank. To this bill the defendants demurred, and the court below sustained the demurrers. The original bill was defective for lack of precision in several of its clauses charging negligence; but this defect seems to have been cured by two amended bills, filed by leave, and does not seem to have been made by the court below the ground on which the demurrers were sustained. The appeal to this court is from the decree below sustaining the demurrers. The case is here, therefore, on the question whether the president and directors of this bank were liable, and should be held responsible, for the losses sustained by the bank through their negligence in the particulars set out in the bill of complaint and its amendments.

Counsel for the defendants rely, in their contention that the directors of the bank should be exonerated from blame and exempted from liability, chiefly on the decision of the supreme court of the United States in the case of Briggs v. Spaulding, 141 U. S. 132–174, 11 Sup. Ct. 924. That decision is a valuable contribution to the law of the perplexing question, how far, in what cases, and under what circumstances directors of national banks should be held liable for losses sustained by these banks as the result of neglect of duty on their part. These officers receive no compensation. They are under no compulsion to give regular attendance to directors' meetings, and to their official duties. They are chosen for their exceptional character and standing in the community, and for their supposed knowledge of its business, and of the pecuniary responsibility of those who borrow from the bank. The most valuable directors are those who are indifferent to any advantage or prestige which the position may give them, and who serve the bank from motives which could not be compensated by money. The courts, therefore, in dealing with instances of gross and glaring negligence on the part of directors of banks, are under perplexing restraint lest they should, by severity in their rulings, make directorships repulsive to the class of men whose services are most needed; or, by laxity in dealing with glaring negligences, render worthless the supervision of directors over national banks, and leave these institutions a prey to dishonest

executive officers. The decision in the case of Briggs v. Spaulding is chiefly valuable as furnishing examples of directors whom the courts should not hold to account for neglect of duty. That case went in the court below beyond the demurrer, and was heard on the merits and on full proofs. It was one of the allegations of the bill that the bank was entirely solvent and in sound condition on the 3d October, 1881. It failed on the 14th April, 1882. Other facts in the case were as follows: On the 10th January, 1882, a board of directors was elected, composed of Spaulding, Johnson, Francis Coit, Lee, and Vought; Spaulding and Johnson for the first time. Lee was elected president, and thereupon ceased to be cashier, an office he had held for many years. The cause of the bank's suspension April 14th was recklessness of management by Lee while cashier, and after he became president. It was not contended that the defendants had knowingly violated, or permitted to be violated, any of the provisions of the national banking act, or that they were guilty of any personal dishonesty in administering the affairs of the bank; but it was charged that they were lacking in diligence in the performance of duties enjoined upon them by the act. The suit was against Lee, Francis Coit, Spaulding, Johnson, Cushing, the executrix of Vought, and the administrators of Charles Coit. The last named had been president and director for several years until his death, in December, 1881. Except this Charles Coit and Cushing, the men sued were those who had been elected directors on the 10th January, 1882. Two of the defendants—Spaulding and Johnson— were elected then for the first time. The bank had lost its capital of $250,000 and also a surplus of $74,000, and had incurred liabilities in excess of assets to the amount of $535,000. All this had occurred between October 3, 1881, and April 14, 1882, when the bank suspended; all directly through the wrongful conduct of Lee, and indirectly, as charged, through the negligence of the directors. The bill was taken for confessed as to Lee and as to the executrix of Vought. As to Cushing, it was proved that he had resigned as director, and sold all his stock in the bank, on the 24th September, 1881, and was never a qualified director afterwards, or capable of negligence. Charles Coit had obtained leave of absence on the 3d October, 1881, on account of severe illness, of which he died December 11, 1881. Johnson was newly elected in January, 1882; very soon after which time his wife became severely ill, and he himself, in consequence, fell into such mental and physical infirmity as to be incapacitated for business. Spaulding was 72 years of age, had retired from business, was elected for the first time on the 10th January, 1882, was wholly unacquainted with the business of the bank, and was not expected, when elected, to give close attention to its affairs. He had been author of the national banking act as a member of congress, and was put on the board of this bank on account of his high character and wide popularity. In his answer he stated numerous circumstances tending to exonerate him from blame for inattention to the active duties of a director, which need not be detailed here. He and Johnson had been directors for the period of only three months; and in regard to the mental and

physical condition of Johnson, and the age and other circumstances of Spaulding, it was a question whether they could reasonably be expected to have familiarized themselves with the affairs of the bank within that time. As to Francis Coit, he had been elected to° replace another director on May 20, 1881, when in very feeble health, and unable to transact any business. He was re-elected in January, 1882. Under the affliction of rheumatism, finding himself unable to give attention to his duties, he had sold all his stock in the bank on the 11th April, 1882, three days before its suspension, in ignorance of its unsound condition. The supreme court decided that Cushing, the two Coits, Spaulding, and Johnson could not reasonably be held liable in their personal estates for the losses the bank sustained during their tenures of office as directors. It held that the degree of care to which those directors were bound was that "which ordinarily prudent and diligent men would exercise under similar circumstances; and in determining *that,* the restrictions of statute and the usages of business should be taken into account. What may be negligence in one case may not be want of ordinary care in another, and the question of negligence is, therefore, ultimately a question of fact, to be determined under all the circumstances" of each case. To this decision of the supreme court exonerating Cushing, Coit's estate, Spaulding, Johnson, and Francis Coit there was a strong and imposing dissent. The justices were Harlan, Gray, Brewer, and Brown, whose objections are stated in an extended and very cogent opinion written by Mr. Justice Harlan. Such a dissent admonishes the federal courts which, in the course of duty, have to deal with this question, very strongly against exceeding the limits of leniency exhibited by the supreme court towards the directors with whom it dealt in the case of Briggs v. Spaulding.

In the case at bar we have an essentially different state of facts to consider. The frauds and irregularities which resulted in the ruin of the bank went on through a period of more than three years, during all of which time the defendant directors were in office. Many of these irregularities were not things of secret occurrence and sudden development. They were such as must have been known to the defendants, if they gave even the most casual attention to the affairs of the bank. The embezzlement of Bowden, the $45,000 loans to the Northrops and to Kerchner, and the losses resulting, were facts that could not have eluded the most cursory attention of the directors to their duties. In respect to their omission to register the mortgages, it is a mistake to suppose that the directors of national banks cease to be such, and that their duty to the bank lapses, when an examiner is put in charge of its funds, properties, and books by the comptroller of the currency. It is incumbent upon them to give attention to these affairs even more specially after the examiner takes charge than before. In the case at bar it was especially their duty to register the mortgages held by the bank from Mitchell, Boatwright, and the Northrops. Their duty was the more special and urgent in respect to these securities in consequence of the fact that the management of the affairs of the bank had been taken from its own executive officers and committed to a temporary

officer appointed by the comptroller, who in all probability was unfamiliar with the registration laws of North Carolina. They were still as much the advisers of the bank examiner as they had been of the cashier, notwithstanding they were not invested by law with the control over him, which they were empowered to exercise over the cashier. It was especially the duty of the defendant directors, acquainted as they were with the local laws of registration, to see to and make certain the prompt registration of the three mortgages. Their duties as directors did not cease in these respects until after the appointment of the receiver of this bank.

In respect to the action of the defendants, or some of them, in checking out their deposits two months before the suspension, in full knowledge that such an event must occur, there could be no adjudication except after plenary proofs. That depositors generally are at liberty to check out the entire funds at their credit before suspension is clear; but even they, after suspension, are entitled only to such percentage of their deposits as the assets of the bank will liquidate. If directors are depositors, and know two months or more before suspension that that event is inevitable, and that the bank can pay only a percentage of its deposits, and yet check for the whole of their own balances, thereby diminishing the percentage to which other creditors would be entitled, they certainly defraud, to the extent of the diminution, the creditors whose interest they are relied upon to protect, and should be held to strict accountability. In the present stage of this case the incident is of importance only in showing that the defendant directors were not prevented by any special circumstances from giving close attention to the affairs of the bank when their own personal interests were seriously involved.

On the whole case as shown by the record, we are of opinion that the court below erred in sustaining the demurrers to the bill as finally amended, on the grounds stated in the opinion of the learned judge below, and that the decree must be reversed. The case must go back to the court from which it came, the demurrers there filed must be overruled, and the case proceeded in on plenary proofs to a decree on the merits.