## WHEELER v. AIKEN COUNTY LOAN & SAVINGS BANK et al.

### (Circuit Court, D. South Carolina. July 1, 1896.)

**1. BANKS AND BANKING — IMPROVIDENT LOANS — LIABILITY OF OFFICERS AND DIRECTORS.**

The customs and methods of the community in which a banking business is done are, for such community, a standard of prudence and diligence by which the responsibility of the bank officers and directors at common law is to be tested; and if there has been a reasonable conformity to these, and absolute good faith and honesty of purpose, it would be unjust to hold them to a personal accountability to stockholders for loans which subsequent events proved unwise.

**2. SAME—NEGLIGENCE OF DIRECTORS.**

The directors of a bank may commit its business to duly-authorized officers, exercising ordinary care and prudence in their selection; but this does not absolve them from the duty of reasonable supervision, or shield them from liability for the wrongdoing of such officials, if, through gross inattention, the wrongdoing has been permitted, or has escaped their notice.

**3. SAME—LOANS TO DIRECTORS.**

While the lending of an amount equal to about one-third of the capital stock of a bank to a single person would seem to be unwise and hazardous, yet, where such a loan was made to one of the directors, who was the chief merchant of the town, largely while his business and financial standing were good, and afterwards to preserve his credit, and with an entirely honest purpose on the part of the bank officials to enable him to continue business, in the hope that he would finally be able to pay, *held,* that this was not sufficient, at common-law, in the absence of any trace of fraud, to render the directors of the bank personally liable to the stockholders (depositors and creditors having been fully paid) for resulting losses.

**4. SAME—PROHIBITORY STATUTES.**

A state statute merely forbidding the directors and other officers of a state bank from borrowing any money from the bank, on pain of criminal prosecution (Rev. St. S. C. § 1540), affects only the officer so borrowing, and does not make other directors personally liable to the stockholders for losses resulting therefrom.

**5. SAME—SALARIES OF OFFICERS—PUBLISHED REPORTS—ESTOPPEL.**

Where the officials of a bank, being large stockholders, and desirous of making a good showing, omitted to draw their salaries for the first year, the sums due being placed to the credit of the bank, and no mention thereof made in the published report required by the statute, *held,* that this omission to publish did not, as against other stockholders (as distinguished from creditors), estop them from claiming their salaries upon the failure of the bank.

This was a bill in equity by Godfrey Wheeler, as a stockholder in the Aiken County Loan & Savings Bank, against the bank and certain of its directors, alleging mismanagement, insolvency, wasting of assets, illegal loans, etc., and praying for an injunction, the appointment of a receiver, etc.

Mitchell & Smith, for complainant.

Henderson Bros. and Buist & Buist, for defendants.

BRAWLEY, District Judge. The main question upon the final hearing of this cause was the liability of the defendant directors for losses upon loans made by the bank to the directors Hall and Warnecke. Hall is indebted to the bank in the sum of about $2,000,

one-half of which is upon a note for his original subscription to the capital stock, and the remainder for moneys advanced from time to time, for which the bank holds collateral security. There is no proof of Hall's insolvency, or that he will be unable to pay the amount due by him. Warnecke's indebtedness at the time of the hearing amounted, with interest, to about $18,000; and, as all of his property has been sold since the commencement of these proceedings, it is assumed that this will be a total loss,—the testimony showing that he is insolvent, and that the collateral securities, consisting mainly of farmers' notes, and chattel mortgages and insurance policies, will realize but little.

The Aiken County Loan & Savings Bank was a banking corporation organized under the General Laws of the State of South Carolina in August, 1888, and doing business at Aiken. The bill was filed March 21, 1894, by Godfrey Wheeler, a stockholder, alleging insolvency, the wasting of assets, illegal and improvident loans made to directors, and the futility of applying to the directors to redress injuries committed by themselves. A temporary restraining order, and a rule to show cause why a receiver should not be appointed, were issued. Upon the return to the rule, and before any determination of the questions arising, there was a suspension of proceedings, by consent of parties, with a view to a reorganization. The negotiations with that intent not proving successful, it was determined by the parties that the winding up of the affairs of the bank would be to the interest of all concerned; and an order was entered, by consent, appointing a receiver. The receiver has paid the creditors in full, and estimates that there will be a sufficient fund to pay to the stockholders a dividend of from 20 to 25 per cent. of the par value of their stock.

Upon the issue made as to the liability of the directors for the alleged improvident and illegal loans, it is claimed by counsel for G. W. Williams, Jr., one of the directors, that the bill, as to him, should be dismissed for want of equity; that it is obnoxious to the ninety-fourth rule in equity, respecting suits brought by stockholders against a corporation and other parties, founded on rights which might be properly asserted by the corporation itself. It is further contended in behalf of Williams that, being a resident of Charleston, it was understood at the time when he accepted a directorship that his duties did not require of him personal attention to, and supervision of, loans made by the bank; that, in the nature of things, a nonresident director could not be expected to have that knowledge of persons and credits which was demanded in order that such function should be judiciously exercised; and that his duty as director was fully performed by assisting the bank to secure satisfactory connections and correspondents at the money centers, and by such advice and counsel in the general conduct of the banking business as his greater experience enabled him to give, and by an occasional visit. In behalf of Burckhatter, it was contended that he was a plain farmer, entirely unacquainted with the banking business; that finding himself upon a board with such magnates as Mr. Phinizy, a wealthy banker of Augusta (not within the juris-

diction, nor served with process), and Mr. Williams, he supposed that everything would be correctly done. He attended all meetings of the board to which he was summoned, and his confidence in the management of the bank is attested by the fact that he was a constant depositor. He deposited with it a large sum of money only a few days before the commencement of these proceedings. His death has since supervened, and it is contended in behalf of his administrator that the action against him must abate, being in the nature of tort, under the principle of the maxim, "Actio personalis moritur cum persona." The conclusion reached by us renders it unnecessary to consider the special pleas set up by Williams and Burckhalter's administrator; for we are of opinion that the facts proved do not entitle the complainant to a decree against the directors, or any of them.

It appears from the testimony that Woolsey, the president, and Ashhurst, the cashier, were intrusted with the management of the bank (under section 1541 of the Revised Statutes of the state, under which the bank was organized, the directors had power to appoint such officers for the general conduct of its business); that they were men of character and standing in the community; that Ashhurst had been connected with another bank, and had had large experience as a bookkeeper; that each of them held stock in the bank to the amount of $10,000, the two owning two-fifths of the entire capital stock; that Warnecke was a merchant doing a large business (the largest, in fact) in the town of Aiken; that he was the largest depositor in the bank; that he had enjoyed good credit; that he was the agent of the Farmers' Alliance in Aiken county, at that time a large organization; that, besides doing a general mercantile business, he made advances to farmers, taking liens and chattel mortgages. At the time when he began doing business with this bank, there can be no doubt that he would have been considered a desirable customer by any person or corporation doing a banking business in the community in which he lived; and it has been proved, and not controverted, that loans to farmers upon liens and upon chattel mortgages was considered a safe and proper business for banks in Aiken, which was the county seat of an agricultural community. The lending of an amount exceeding one-third of the entire capital of the bank to any individual would seem unwise and hazardous. The event has proved it to have been disastrous. In determining the question of legal responsibility therefor, as presented here, the circumstances under which this money was advanced must be considered, not as looked back upon from our present standpoint, but as they were at the time, and as looked forward to. Warnecke was, as has been stated, the chief merchant of the town. His place of business was very near the bank, where he kept a running account; making daily deposits of his cash receipts, and drawing thereon. At the end of each month his overdrafts would be settled by notes with collaterals as described. When the indebtedness had gradually increased to an amount between $6,000 and $10,000, the cashier became concerned; and, the president being consulted, additional security was demanded. A

chattel mortgage on his stock of merchandise was taken, and later a mortgage on all of his real estate, which was not recorded, under the apprehension that it would injure his credit,—already impaired, as is claimed, by reason of the fall in the price of cotton. Such moneys as were advanced after this period were for the purpose of postponing impending failure. The extreme financial stringency and panic of the summer and fall of 1893, which prevailed over the whole country, are circumstances to be taken into account. The final crash came to Warnecke with the proceedings in this cause. Whether it could have been averted by further advances or indulgence, or whether such postponement of the evil day would have resulted in greater disaster to the bank, is a question which cannot be answered. There is no charge, insinuation, or suspicion that the president or cashier of the bank were in any wise interested in business with Warnecke. There was no apparent object in increasing his accommodations, apart from the desire to serve the interest of the bank, in which they were the largest stockholders. In view of the liabilities he was already under, and the condition of his business, as they then understood it, of the fact that they would be the largest sufferers by his failure, and that they appear to have acted in good faith, with the desire to protect the interests of the bank, there does not seem to be any just ground upon which any of the directors can be properly charged for this indebtedness. That this was not good banking may be admitted. That it would not stand the test of those rigorous principles applicable to technical trustees may also be conceded. The law has not defined, and, in the nature of things, cannot define rigidly, the rules and conditions under which banks may lend money. In such business much depends upon trust,—upon reliance upon character, and business integrity, thrift, and capacity, which may often justify the prudence of a transaction which to lawyers, seeking to apply hard and fast rules, might seem indefensible and reckless. The customs and methods of the community in which the business is done are, for such community, a standard of prudence and diligence by which the responsibility of bank officers and directors is to be tested; and if there is ground to believe that there has been a reasonable conformity to such methods and customs, and absolute good faith and honesty of purpose, it would be unjust to hold to a personal accountability for loans which subsequent events proved unwise. All of the facts proved in this case go to show that the transactions with Warnecke were of such nature that men of ordinary prudence, engaged in the business of lending money, might have done exactly what the officials of this bank did. He was a merchant of good standing and credit, doing a large business, which required accommodations from the bank. As his obligations grew, more money was needed to save the first advances, until one of those periods of financial stringency, not uncommon, brought shipwreck. Men of extraordinary prudence and financial foresight might have foreseen the end, but directors of a small bank in a small town cannot be justly held to personal accountability for failing to select as its managers men of extraordinary gifts. Such men are rare

anywhere, and it cannot be imputed as a fault to these directors that such services were not secured for the meager salaries paid to the officials of this corporation.

It is difficult to define with precision the exact measure of obligation imposed upon the directors of a banking corporation. So much depends upon the character of the bank, and of its business; the methods, customs, and habits of the community in which it is located,—that any attempt to lay down rigid rules by which its officials and directors should be governed would be mischievous. The subject received critical examination in the supreme court of the United States in Briggs v. Spaulding, 141 U. S. 133, 11 Sup. Ct. 924. The opinion of the court, delivered by the chief justice, and the dissenting opinion, review most of the cases. It may be stated as the result of this examination that the law holds it to be the duty of directors to direct; that they are not mere figureheads; that they may commit the banking business to duly-authorized officers, exercising ordinary care and prudence in their selection, but this does not absolve them from the duty of reasonable supervision, or shield them from liability for the wrongdoing of such officials, if, through gross inattention, such wrongdoing has been permitted or has escaped their notice. While not trustees, in a technical sense, some of the duties required of trustees are demanded of them; and if, through their supine negligence and inattention, the officers of the bank, by systematic neglect of ordinary precautions, or by fraud, bring it to ruin, which could have been prevented by that amount of vigilance and supervision which persons of ordinary discretion generally exercise as to their own affairs, such directors cannot escape responsibility. They cannot be permitted to shut their eyes, if by keeping them open they could see and prevent. Being gratuitous mandataries, they are only liable for fraud or gross negligence; and this is ultimately a question of fact, and the correct determination of it depends upon the facts of each case. No case has been cited where directors have been held responsible to stockholders for mistakes of judgment, or want of skill, on the part of the officers selected by them to conduct the business of the bank. In every case where such directors have been held to account, they have been either themselves guilty of some fraud, or have connived at fraud in others, or, by their supine negligence and inattention, permitted some fraud which ordinary attention might have prevented. No element of fraud enters into the case now under consideration. There is no pretense that the officers of this bank had any share in Warnecke's business, or that they, in any way, were to receive a benefit to themselves from the loans to him. There are some dicta here and there through the reported cases which may seem irreconcilable with the principles here stated. It will be found in all such cases that the facts are at variance with those under consideration. We are not considering liability to depositors or creditors. The cases cited by the learned counsel for the complainant utterly fail to sustain his contention, in that the facts out of which they grew have no likeness to those proved in

this case. Martin v. Webb, 110 U. S. 7, 3 Sup. Ct. 428, only decided that, in a contest between the corporation and those dealing with it, the acts of the cashier are binding on it; when, from a long course of dealing, the directors may be presumed to have known what, by ordinary attention to their duties, they could have known, the bank would be estopped from denying that certain acts done by the cashier were by its authority. There are some general observations on the duty of directors, which are in entire consonance with the views hereinbefore expressed. Briggs v. Spaulding, 141 U. S. 133, 11 Sup. Ct. 924, was a suit by a receiver to enforce liability of directors of a national bank wrecked by its president through loans to himself, his family and friends, who were engaged in speculations. The court held that the directors were not responsible, though there is a strong dissenting opinion holding that there was such continuous negligence on the part of three of the directors as to make them liable for losses which could have been avoided by reasonable diligence on their part; that the dishonest practices of the president extended over so long a period that ordinary attention by the directors to their duties would have discovered and prevented them. Through these frauds and wrongful acts the entire capital and surplus of the bank were lost, and liabilities to more than double the amount of the capital were incurred. Robinson v. Hall, 12 C. C. A. 674, 63 Fed. 222, was also a suit by a receiver of a national bank, and was decided upon a demurrer to the bill of complaint. The court says (page 679, 12 C. C. A., and page 227, 63 Fed.):

"The frauds and irregularities which resulted in the ruin of the bank went on through a period of more than three years, during all of which time the directors were in office. Many of these irregularities were not things of secret occurrence and sudden development. They were such as must have been known to the defendants, if they gave even the most casual attention to the affairs of the bank. The embezzlement of Bowden [the cashier], the $45,000 loans to the Northrops and to Kerchner, and the losses resulting, were facts that could not have eluded the most cursory attention of the directors to their duties."

In that case it was also charged that the directors, with full knowledge of the impending failure, withdrew their deposits.

These are the cases relied upon by the complainant. The slightest examination shows a state of facts essentially and entirely different from those in the case at bar. At common law, and in the light of adjudicated cases, the grounds upon which it is sought to enforce the liability of these directors is so slight as to merit no further attention. It remains to consider whether such liability arises under the statutes of South Carolina. Section 1540 of the Revised Statutes is as follows:

"No director or other officer of such bank shall borrow any money from said bank, and if any other officer or director shall be convicted upon indictment of directly or indirectly violating this section he shall be punished by fine or imprisonment or both at the discretion of the court."

It will be seen that there is not any imperative prohibition against making the loans, nor is any penalty denounced against the officers who lend the money, nor is the repayment of the loan a mitigation

of the offense.   It is a penal statute, whose effective force is directed against the party borrowing, and affects him alone.   The violation of the statute might subject the corporation to a forfeiture of its franchises.   That is a question which we do not have to consider.   It does not, in terms, impose any civil liability in damages.   As it creates an offense which did not exist at common law, no reason has been suggested why it should not be construed strictly, as such statutes usually are.   Newly-created liabilities cannot be extended beyond the express provision of the statute, and where penalties or remedies are provided the mode of procedure follows the statute.   Where an action was brought by creditors against the trustees of a corporation, to charge them individually under a New York statute which made it a penal offense to pay dividends to stockholders which would diminish the amount of the capital stock, it was held, in Rorke v. Thomas, 56 N. Y. 560, that the directors had rendered themselves liable to the penalty denounced by the statute, but that the liability could not be extended beyond the strict terms of the statute; and, to the extent of the costs in the judgment against the company, the judgment was held erroneous.   In Bank v. Matthews, 98 U. S. 621, where loans by a national bank on real-estate security were expressly prohibited by law, it was held that this did not render the security void; and it has been repeatedly held that where a statute imposes a penalty on an officer for solemnizing a marriage under certain circumstances, but does not declare the marriage void, the marriage is valid, and the penalty attaches to the officer who did the prohibited act.   While the statute undoubtedly indicates that it is the policy of the law to discourage borrowing by directors, it does not go to the extent of making such loans illegal, nor impose a penalty on the officials who lend the money.   We cannot, by construction, supply the deficiency, and impose a penalty which the law does not impose.   Our attention has not been called to any decisions upon this question, and we leave it with the citation from Morawetz on Corporations (section 556) quoted by the chief justice in Briggs v. Spaulding:

"The liability of directors for damages caused by acts expressly prohibited by the company's charter or act of incorporation is not created by force of the statutory prohibition.   The performance of acts which are illegal, or prohibited by law, may subject the corporation to a forfeiture of its franchises, and the directors to criminal liability, but this would not render them civilly liable for damages."

Holding as we do that all the circumstances attending the advances to Warnecke show good faith; that none of the officials of the bank were interested in his business, or had any other motive than the desire to do what they conceived to be to the interest of the bank; that the failure to record the real-estate mortgage did not entail a loss of more than $500 or $600, and was induced by the honest belief that the credit of the debtor, and therefore his ability to pay the whole debt, would be promoted; that the insolvency of Warnecke was brought about or intensified by financial conditions for which neither the directors of this institution, nor himself, were directly responsible; that the greater part of the

moneys advanced to him was for the purpose of saving the original debt, which was not in excess of such credit as reasonably prudent men would have extended to him, and there being in the whole transaction an entire absence of fraud, or any suggestion of those fraudulent practices which commonly attend such failures,—we cannot find any just ground for holding either the officials of the bank, or the directors of the corporation, personally responsible for the amount of this indebtedness. This disposes of the main question in the cause. Inasmuch as certain other questions have been heretofore disposed of by an order overruling the master's report thereon, it may be convenient to restate them, so that parties, if so advised, may have the opportunity of reviewing them upon an appeal.·

The first relates to salaries allowed the president and cashier, which question arose in this wise: The president claimed a salary of $50 per month; and the cashier, $100 per month, out of which he paid for certain clerical services. The records of the bank do not show any formal entry fixing these amounts. The testimony shows that there was an understanding that the salaries should be as stated, and we are of opinion that the sum is reasonable. During the first year's operations the sum of $1,450 was charged up for salaries, but not drawn out. It went to the credit of the bank. Certain sums on account of salaries were drawn out from time to time, but the whole amount claimed was not drawn; the explanation given being that as they were large stockholders, and anxious to make the bank a success, they wanted to make a good showing in their published reports. For this reason the reports, which, under the law of the state, were required to be published quarterly, contained no mention of this indebtedness on account of salaries. It is claimed by the cashier that interest earned, but not charged up, would about offset this amount. Be this as it may, it appears that in March, 1894, when they apprehended that the complainant might commence suit, but before the proceedings were commenced, acting under the advice of the attorney for the bank, they entered upon the books, to the credit of each, the amount found to be due, the aggregate being $5,750. It is claimed that the omission to publish creates an estoppel. Without considering what might be the result if this were a suit by a creditor, we are of opinion that, under the circumstances of this case, the rule as to estoppel in pais does not apply, and adhere to the decision already made,— that the report of the special master as to this item should be set aside.

The second item relates to the claim against Woolsey and Ashhurst, growing out of the discounting by the United States National Bank of a note for $1,500 of the T. G. Lamar Kaolin Company. All of the facts and testimony relating to this transaction have been re-examined, without changing the conclusion originally reached,— that there is no ground upon which the report of the special master can be sustained. It is therefore set aside.

The third item relates to the charge on account of interest claimed to be due upon certain alleged bills receivable. The proofs clearly show that these bills receivable had no existence; that overdrafts

were made by Woolsey, and interest was charged against and paid by him on account of such overdraft; that a memorandum was made by the cashier of about the amount of these overdrafts, and the same was stated as a bill receivable of "W. W. A.," the initials being those of Woolsey. It is clearly established that Woolsey paid the interest on the overdrafts, and that he never made a note. The charge for interest as upon a bill receivable was erroneous. The report of the master upon this item, as upon the similar item of interest on an alleged $6,000 bill receivable, is set aside.

So much of the report as charges a balance against the cashier upon his account in turning over the assets to the receiver is not sustained by the proofs or the figures; and the report, as to that item, is set aside.

Upon the whole case, after a hearing one year ago upon the report of the special master, and a re-examination and reconsideration of all the testimony presented then, with the fuller light of all the testimony and argument upon the final hearing, our conclusion is that no case has been made against the directors; that, while the conduct of the president and cashier in lending money to directors who had not even paid their original subscription is not approved of, yet, there being no **suspicion of any fraud** in these transactions, or circumstances tending to show that they were themselves to reap any advantage therefrom, we will not hold them responsible for the consequences. As the largest stockholders of the bank, they have been the greatest sufferers by its failure. While such failure may, in some measure, be attributed to their mistakes, and while some irregularities have been charged, for which, in another proceeding, they might be held to account, nothing has been developed which affords any just ground for charging them with dishonesty, or unfaithfulness to their trust.