### WARNER v. PENOYER et al.

(Circuit Court, N. D. New York. August 17, 1897.)

#### No. 6,392.

NATIONAL BANKS—LIABILITY OF DIRECTORS FOR NEGLIGENCE.

Where the affairs of a national bank were managed entirely by its cashier, who was reputed and universally believed to be honest and capable, but whose dishonesty and reckless management resulted in wrecking the bank, the president and directors, who knew little of the business of banking, and most of whom were farmers, were not guilty of negligence rendering them liable for the losses to creditors because they failed to examine the books; the statements prepared and furnished them by the cashier, and which purported to be made from the books, showing the bank to be in a prosperous condition, and there being no grounds of suspicion known to them. Briggs v. Spaulding, 11 Sup. Ct. 924, 141 U. S. 132, followed.

This was a suit in equity by John W. Warner, as receiver of the First National Bank of Watkins, N. Y., against William J. Penoyer and others, directors of said bank, for losses of the bank alleged to have been caused by defendants' negligence as such directors.

Martin S. Lynch and Edward Winslow Paige, for complainant.

Frank C. Avery, Charles M. Woodward, and Frederic Collin, for defendants.

COXE, District Judge. The complainant, as receiver of the First National Bank of Watkins, N. Y., seeks to recover of the defendants, who were directors of the bank, for losses alleged to be due to their negligence. Watkins is a village of about 3,000 inhabitants in Schuyler county, N. Y., situated in the midst of an agricultural community. The First National Bank of Watkins, succeeding the Schuyler County Bank, was organized in 1883 with a capital of $50,000. It closed its doors, hopelessly insolvent, on the 8th of February, 1894. William N. Love was president of the bank from 1885 until August, 1892, when he died. The defendant Adrian Tuttle, who was a director from the organization of the bank, became its president upon the death of William N. Love. John W. Love, a son of William N. Love, entered the bank as an errand boy, and rose to the position of cashier before his father's presidency. He was continued in that position until the failure of the bank, being its chief executive officer and having the entire charge of its affairs for at least 18 months prior to

the failure. At the time of his father's death he was about 32 years of age, reputed to be worth two or three thousand dollars. The directors never required a bond from him and he gave none. The reports to the comptroller show that the deposits and discounts of the bank averaged not to exceed about $200,000. When the bank suspended, February 8, 1894, it had lost mainly through the negligence, incompetency and rascality of the cashier, John W. Love, nearly $150,-000. Of this sum about $100,000 was lost during the 18 months subsequent to his father's death and while Tuttle was president. John W. Love is now serving a term in the state's prison for his crimes in wrecking this bank. It is not necessary to enter into the details of his fall. It is the old familiar story. The first false step, the rapidly downward course, the hopeless struggle to avert disclosure by perjury, forgery and theft; discovery, disgrace and then—the penitentiary. The defendants do not deny his incompetency or attempt to palliate his crimes. All agree that the bank was ruined by him. The largest item of loss was through the Western Improvement Company, a speculative concern of which the cashier was vice president, and for which he discounted notes and permitted overdrafts to the amount of $72,000. This account began in October, 1891, gradually growing larger until the failure of the company involved the bank in ruin. It may be conceded that this was reckless, if not dishonest, banking, and that Love's action in permitting it rendered him liable for the loss and renders the defendants equally liable if they connived at or permitted it. The directors were all men of good character and had the confidence of the community. With two exceptions they were farmers. All were unacquainted with the details of banking and had little knowledge of bookkeeping. During the entire period of his cashiership John W. Love had the confidence of the citizens of Watkins. To all outward appearances his character was above reproach; his life blameless. We have then, upon undisputed facts, the following situation: A village bank managed exclusively by its cashier, who is believed to be honest, but whose dishonesty and incompetency result in wrecking the bank. A set of books, for the most part correctly kept, which, if examined, would have disclosed the reckless financiering of the cashier. This examination, depending upon the time it was made, would, probably, have saved the bank from failure or greatly reduced its losses. A board of directors composed of men knowing little of banking, but honest and respected, who intrust the administration of the bank to the cashier relying upon his representations and never examining the books except as statements, purporting to be taken from them, are submitted to the board from time to time. The question of liability can be narrowed to the single inquiry, should the directors have examined the discount register and general ledger? Are they liable for not doing this? The law which rules this controversy must be taken from Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 924. This is true, even though the court may be convinced that the rule contended for by the dissenting justices is conducive to greater stability, conservatism and honesty in all branches of commerce and finance. A somewhat extended experience in the trial of indictments under section 5209 of

the Revised Statutes has led to the conclusion that in fully half these cases an examination of the books of the bank by the directors, or an examiner, would prevent failure, or, at least, would save large sums for the creditors. Furthermore, the knowledge that such an examination is liable to be made at any time would have a most salutary effect in restraining dishonest officers from entering upon a career of crime. The rule laid down by the supreme court does not, however, require such an examination unless the directors become acquainted with some fact calculated to arouse suspicion. The liability of the directors, says the court, in the Briggs-Spaulding Case, "depends upon whether they should have made an examination of the books and assets of the bank," etc. The court holds that they were not required to do this, quoting, with approval, the language of Sir George Jessel in Hallmark's Case, 9 Ch. Div. 332, as follows:

"I know no case, except Ex parte Brown, 19 Beav. 97, which shows that it is the duty of a director to look at the entries in any of the books; and it would be extending the doctrine of constructive notice far beyond that of any other case to impute to this director the knowledge which it is sought to impute to him in this case."

I cannot resist the conclusion that the conduct which the supreme court excused approached much nearer the verge of culpable negligence than that of the defendants in the case at bar. The status of the three directors, whose negligence was in question, is thus characterized in the minority opinion:

"In fact, these gentlemen, while they were directors, had no knowledge whatever of what was being done by Lee in the conduct of the bank. They took his word that all was right, and gave no attention whatever to the management of its business. * * * They signed and certified to their correctness [reports to the comptroller] entirely upon their faith in Lee. They acted as if confidence in him discharged them from all responsibility touching the management of the bank. * * * In the case of Mr. Spaulding, there are absolutely no circumstances of a mitigating character. * * * He performed no duty while director, except 'to examine reports'; but he made no examination to ascertain their correctness. * * * When asked in reference to the enormous overdrafts, made while he was director, and whether he did anything to prevent them, he replied, 'I didn't go to the bank to ascertain. I left the officers in charge as I found them.' * * * 'I never examined its books or affairs, and I only examined the reports which it made to the comptroller, whose duty it was to see that these reports were correct.' * * * It is plain from the evidence that if, with his long experience in banking business, he had given one hour, or at the utmost a few hours' time in any week while he was director, to ascertain how this bank was being managed, he would have discovered enough that was wrong and reckless to have saved the association * * * many if not all the losses thereafter occurring. Upon his theory of duty, the only need for directors of a national bank is to meet, take the required oath to administer its business diligently and honestly, turn over all its affairs to the control of some one or more of its officers, and never go near the bank again unless they are notified to come there, or until they are informed that there is something wrong. * * * The case is one of supine, continuous negligence, upon the part of the three directors named, in the discharge of duties they owed to the bank and to those interested in it."

And yet these men were exculpated.

The question arises, how can this court, in justice, hold these defendants when the only act of negligence is failure to do that, which, on the highest authority in the land, they were not required to do? I have read with interest the able opinion in the case of Gibbons v.

Anderson, 80 Fed. 345. With the views there expressed I am in hearty accord and should be inclined to enter a similar decree if there were here the necessary suspicious circumstances to put the directors upon inquiry. In the Gibbons Case it appeared that the usual dividend was passed in January, 1892, and again in July, 1892, and the court says:

"It would seem to me that at the last-mentioned date the fact that a year had now gone by without any declaration of dividend, and no sufficient explanation thereof being shown, the attention of the board of directors, to the bank's condition, was challenged, and that, in the interest of those concerned, an examination into the causes should have been instituted."

There was also in that case a letter from the comptroller making disclosures and giving warning which was brought directly to the attention of the board; and even this failed to arouse them from their lethargy. In Robinson v. Hall, 25 U. S. App. 48, 12 C. C. A. 674, and 63 Fed. 222, the frauds and irregularities which resulted in the ruin of the bank were of such a character that they must have been known to the directors. In the case at bar, on the contrary, dividends were regularly paid and every one in the community believed the bank to be in a most flourishing condition until the news of Love's flight was made known. Some of Love's frauds were carried on so clandestinely, by false entries and juggling with the books, that it is not pretended that they could have been discovered except by an expert. Others, like his larceny of the cash, it would have been impossible to prevent. The chief accusation against the directors is that they permitted the account of the Western Improvement Company to grow to such large proportions; but they all testify that they were absolutely ignorant of the existence of such an account, and there was no way they could have discovered it short of an actual inspection of the books, for statements purporting to be drawn from the books were from time to time submitted to them. There was nothing to direct suspicion in that direction. At the time they trusted Love no young man in the community stood higher. They had absolutely no reason for thinking that statements presented by him were false and that notes submitted by him were forged or fictitious. These men were none of them bankers or bookkeepers, and the examination by them of statements which, they were informed by a trusted employé, were taken from the books, was surely the next thing to an examination of the books themselves.

The argument for the complainant proceeds upon the theory that the defendant Tuttle, being the president of the bank, was guilty of greater negligence than the other defendants. In other words, if any defendant is liable it is Tuttle. A brief résumé of the testimony as to him will, therefore, suffice for all. Adrian Tuttle is a farmer, 60 years of age, residing in the town of Reading, $2\frac{1}{2}$ miles from the bank building. He had been a director since its organization and was elected president of the bank in the autumn of 1892. He and his family owned $6,000 of the shares of the bank, purchasing $4,000 of this amount in 1892 and 1893 while he was president. John W. Love was employed during Tuttle's connection with the bank, and for some time prior to his presidency Love had been cashier. Nothing

had ever occurred to mar Tuttle's confidence in Love until the morning the bank closed. During his presidency he attended every meeting of the directors. His visits to the bank were frequent, sometimes every day, sometimes every other day, and during haying or harvesting he would come down in the evening and talk with the cashier. When in the bank he frequently did the work of the cashier and the clerks while they were absent making collections or for other purposes. He had numerous conversations with the cashier regarding the condition of the bank and was always informed that it was solvent and prosperous. Weekly statements drawn up by the clerk or cashier were examined by him every Tuesday morning. The last statement of this kind was submitted to him two days before the bank failed. It showed that the bank was solvent and prosperous. That Tuttle had the utmost confidence in the bank up to the last moment of its existence as a going concern, is demonstrated by the fact that he had a deposit there of $420 when the collapse came and made a deposit of $100 on Wednesday—the bank failing on Friday. Shortly before the bank failed he signed a tax collector's bond for the purpose of securing the deposit for the bank and subsequently paid the amount of the loss. At the directors' meetings in response to a request to produce all the notes of the bank the cashier would bring in a bundle of notes and the directors would proceed to examine them. Tuttle swears that he did not know of the overdraft of the Western Improvement Company, or of the discount of its paper. After the cashier absconded Tuttle did what he could to secure his arrest and paid one-third of the reward offered for his apprehension. He has also paid the assessment on his stock. These are the salient features of Tuttle's connection with the bank. It will hardly be controverted that, when compared with Spaulding's directorship in the Buffalo bank, it is a record of activity and prudence. The testimony as to the other directors is substantially the same. Unquestionably they trusted too implicitly to Love, but it would be manifestly unfair to judge them in the light of what now is known of Love's character. At the time they trusted him every one trusted him. Nothing had occurred to shake their confidence in him, or put them upon inquiry. It is true that at the meeting held on the 11th of July, 1893, a list of notes was submitted showing eight $5,000 discounts, but it did not show who were the makers and indorsers. There was nothing to show that these discounts were all for the same party. With the burden upon the complainant it can hardly be said that this proof sufficiently establishes negligence in the teeth of the defendants' oaths that they never knew of the Western Improvement Company's discounts. Assuming that they could be held liable had they known of this transaction, the court must find that they did not know of it, and that the facts were so concealed by Love that nothing occurred to turn their attention in that direction.

After giving this cause the most careful consideration it is thought that under the law of Briggs and Spaulding, which, of course, is controlling upon this court, the liability of these defendants has not been established. The bill is dismissed.